[Civ. No. 23348.  Second Dist., Div. Three.  Apr. 14, 1959.]

THE PEOPLE, Appellant, v. ONE 1956 CHEVROLET 4-DOOR SEDAN, LICENSE NUMBER MVR 021, etc., Defendant; FLETCHER JONES CHEVROLET (a Corporation), Respondent.

Edmund G. Brown, Attorney General, and Lynn Henry Johnson, Deputy Attorney General, for Appellant.

Getz, Aikens & Manning and Harold T. Tredway for Respondent.

VALLÉE, J.—Appeal from a judgment decreeing that an automobile be forfeited to the state, subject to the lien of the legal owner, on the ground it had been used in the unlawful transportation of narcotics.

The court found and decreed that the legal owner had made a reasonable investigation of the morals, responsibility, character, and reputation of the purchaser prior to the creation of its interest. Plaintiff appeals.

■ Plaintiff first contends the evidence was insufficient as a matter of law to establish that a reasonable investigation had been made. The argument is that the only evidence with respect to the investigation was regarding the standard operating procedure of the legal owner.

Section 11620 of the Health and Safety Code in pertinent part provides: "The claimant of any right, title or interest in the vehicle may prove his lien, mortgage, or conditional sales contract to be bona fide and that his right, title, or interest was created after a reasonable investigation of the moral responsibility, character, and reputation of the purchaser, and without any knowledge that the vehicle was being, or was to be, used for the purpose charged."

It was stipulated that the automobile was sold to Odis B. Hendrix on a conditional sales contract in the usual course of business; the contract was bona fide and valid in all respects; the seller—legal owner—had no knowledge that the automobile would be used for any unlawful purpose.

The legal owner, without objection, introduced in evidence a document titled "PURCHASER'S CREDIT STATEMENT," designated Exhibit C. The exhibit showed numerous written notations. About one-third of the way down the document on the left-hand side was a notation, "OK by his employer." To the immediate right of this was the notation, "OK by employer." To the far right was the notation, "OK his employer."

Miss Molloy, the credit manager of the legal owner, testified she recognized the handwriting on Exhibit C as that of June Fatario, who was in the employ of the legal owner in the credit department at the time of the sale. She testified to the method of preparation of the document by explaining the standard procedure followed by the credit department in making the investigation of a purchaser as follows: "We first call the employer and if the employment has been a year or two years, we ask the employer—well, first, naturally we ask if the person has been employed. Secondly, we ask as to their knowledge of the good moral character of the employee, and if he has been in any difficulties that they know of; and thirdly, if his home address is the same as is stated on the application. Q. Now, according to your standard procedure, Miss Molloy, what is

done by the person making the phone call in response to any answers they may receive on such phone calls? A. Well, they write 'okayed by employer' in the separate sections.''

Miss Molloy testified the first notation on Exhibit C meant Miss Fatario had called the employer of the prospective purchaser and was informed by him that the purchaser had been employed the length of time he had specified in his credit statement; the second notation meant she had asked the employer if the purchaser was of good moral character; the third notation meant she had ascertained from the employer that the purchaser's home address was the same as on the credit statement given by the purchaser.

There also appeared on Exhibit C notations with respect to nine business firms and three banks. As to these Miss Molloy testified the legal owner, in investigating the purchaser, obtained the information noted from a service it used, which service had a record of all business houses in Los Angeles; from the service, it obtained information on the customer, including anything that would appear in the legal records with respect to whether the purchaser had been subject to criminal or civil suit; and the service picked up all of this information and relayed it to the legal owner.

The ''PURCHASER'S CREDIT STATEMENT,'' signed by the purchaser, gave his wife's name, stated she was employed, and by whom. Miss Molloy testified Miss Fatario had checked with the employer of the purchaser's wife; the notation ''OK by employer'' applied equally to the purchaser's wife; and if there had been anything derogatory it would have been noted on exhibit C.

Exhibit C was competent evidence to establish the facts therein stated. (Code Civ. Proc., § 1953f; *Loper v. Morrison*, 23 Cal.2d 600, 608 [145 P.2d 1].) The weight to be given the document was for the trial court. (*Gallup v. Sparks-Mundo Engineering Co.*, 43 Cal.2d 1, 7-8 [271 P.2d 34].) Whether the investigation was reasonable is a question of fact. (*People v. One 1952 Ford Sedan*, 146 Cal.App.2d 183, 187-188 [303 P.2d 832].)

The testimony of Miss Molloy was with respect to what investigation had been made by Miss Fatario, not merely as to the standard operating procedure of the legal owner. We cannot say, as a matter of law, that the evidence was not sufficient to support the finding that a reasonable investigation had been made.

*People v. One 1941 Chevrolet Coupe*, 113 Cal.App.2d 578

[248 P.2d 786], relied on by the People, is not in point. The court there found that the legal owner did not make a reasonable investigation; here the court found the contrary. In that case there were no records of an investigation produced; here the record and the testimony of Miss Molloy showed the details of the investigation.

The People next contend the property was transferred to the purchaser before the investigation was made.

On September 15, 1956, the purchaser and the legal owner signed a document styled "Sales Order, Confirmation And Sales Agreement." This document provided:

"At the time the above described automobile is ready for delivery Purchaser agrees to pay the foregoing Unpaid Cash Balance in full, plus or minus any pay-off adjustment. In the alternate, and, subject to approval of Purchaser's credit, Purchaser will enter into a Conditional Sale Contract with Dealer or its assigns, which shall provide, in addition to the standard printed conditions thereof, as follows: . . .

"In addition to the foregoing, said contract shall provide for the following payments, which include Time Sales Differential:

"Special Pick-up Payments:

$_____ on _____ $_____ on _____

Regular Payments:

$ 93.21 per month, for 30 equal monthly payments, beginning Oct. 28th, 1956, plus a final payment of

$_____ on _____."

The signature of the purchaser appears after the following: "I acknowledge receipt of a copy of this order." The reverse side of the document is headed "CONDITIONS." One of the conditions reads:

"Delivery of this automobile is accepted by purchaser subject to credit approval by a financing institution, and in the event of a credit report unacceptable to the financing institution, the purchaser will return the automobile herein described immediately to the dealer."

Following the conditions, the purchaser's signature appears after the word "Buyer." The automobile was delivered on September 15, 1956. The investigation was made on September 17, 1956.

The legal owner did not submit its contracts to a financial institution. It financed its own contracts. By the terms of

the "Sales Order, Confirmation And Sales Agreement" the purchaser was obligated to return the automobile to the dealer in the event its investigation was unacceptable.

Under a contract of sale the property is transferred to the buyer at the time the parties intend it to be transferred; and their intention may be disclosed by their conduct, common usage, and the circumstances of the case. (Civ. Code, § 1738.) ■ The conduct of the parties may disclose their intent as to when property was transferred from seller to buyer. (*Everly* v. *Creech*, 139 Cal.App.2d 651, 657 [294 P.2d 109].) ■ The passage of an interest in property is governed by the intention of the parties whenever such intention can be ascertained, and it is only when there is no indication as to such intention that the seller can be said to have unconditionally delivered the property to the buyer. (*Woodbine* v. *Van Horn*, 29 Cal.2d 95, 106-107 [173 P.2d 17]; *Goldberg* v. *Southwestern Metals Corp.*, 92 Cal.App.2d 819, 821 [208 P.2d 75].)

■■ Referring to section 11620 of the Health and Safety Code, the court in *People* v. *One 1950 Pontiac Sedan*, 153 Cal. App.2d 15 [313 P.2d 863], stated (p. 19):

"The purpose of this statute is to relieve the holder of a legitimate lien from the effect of the forfeiture provisions of that chapter of the Health and Safety Code, when such lienholder has made an adequate investigation before the creation of the lien on which he relies at the time the vehicle is seized. A claimant may well have had a different 'right . . . or interest' at various times, and it does not clearly appear that the statute was intended to provide that the prior creation of a temporary and conditional interest would destroy the right to such relief, when such prior interest was followed by a more substantial and definite interest upon which the claimant thereafter relied and which was created, in a practical sense, after the required investigation had been made.

"It seems clear that this conditional assignment to the bank would create a temporary interest which would remain in effect until the time when the bank found the sales contract to be satisfactory and elected to accept it. But this was not necessarily the same absolute right or interest which the bank held at the time the vehicle was seized and which it was entitled to prove at the trial. When the bank completed its investigation and decided to retain the sales contract its position was materially changed and it may reasonably be said that a new and more definite 'right . . . or interest' was then 'created,' within the meaning of the statute. In stating that a

'claimant' may prove that his 'right . . . or interest was created after a reasonable investigation' the statute clearly refers to the right or interest upon which the claimant then relies, and the time when that particular interest was created. It would seem unreasonable to believe that the statute was intended to enforce a forfeiture against the lienholder in such a case as this, where the interest relied on by the lienholder did not become effective until after an investigation was made, merely because some conditional and preliminary steps toward obtaining that interest were taken before the investigation was made.

"To so construe the meaning and intent of this statute would not, as appellant contends, defeat the purpose of the statute by allowing automobiles to be left in the hands of narcotic users for 15 days, or longer periods by agreement, during which time the lender would have an interest in the vehicle. During that period the limited right or interest in the prospective lender, even under a dealer contract of this nature, would have been created before the investigation was made, and the forfeiture provisions would apply during that time. After the investigation was made, however, a somewhat different and more definite right and interest came into being or was 'created,' which interest was the one claimed by the bank in this proceeding. It would be unnecessarily harsh to disregard the investigation which was actually made here, and the acts done in reliance thereon. The wording of the statute does not seem to require that it be given such an application under the circumstances here appearing."

When read as a whole, whether the document signed on September 15, 1956, constituted merely a sales order or a conditional sales contract, it indicates that it was intended thereby to allow whoever financed the contract time within which to make a reasonable investigation of the moral responsibility, character, and reputation of the purchaser. At bar, the legal owner was the financing institution. In view of the language of the statute and the provisions of the "Sales Order, Confirmation And Sales Agreement" and under the facts found, the trial court could reasonably conclude that the legal owner had proved the property was not transferred to the buyer until after a reasonable investigation within the meaning of the statute.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.